# IN THE SUPREME COURT OF CALIFORNIA

CALIFORNIA SCHOOL BOARDS ASSOCIATION et al.,
Plaintiffs and Appellants,

v.

STATE OF CALIFORNIA et al.,
Defendants and Respondents.

S247266

First Appellate District, Division Five
A148606

Alameda County Superior Court
RG11554698

---

December 19, 2019

Justice Liu authored the opinion of the Court, in which Chief Justice Cantil-Sakauye and Justices Chin, Corrigan, Cuéllar, Kruger, and Groban concurred.

---

CALIFORNIA SCHOOL BOARDS ASSOCIATION v. STATE
OF CALIFORNIA

S247266

Opinion of the Court by Liu, J.

In 2010, during a period of economic recession, the Legislature enacted two statutes requiring a portion of state funding provided annually to local education agencies to be used prospectively as "offsetting revenues" under Government Code section 17557, subdivision (d)(2)(B) to satisfy two existing state reimbursement mandates. (Ed. Code, §§ 42238.24 [Graduation Requirements], 56523, subd. (f) [Behavioral Intervention Plans].) These statutes designate previously non-mandate education funding as restricted funding at the start of the next fiscal year to satisfy the state's obligation to reimburse school districts for these two mandates. The question is whether the statutes on their face violate the California Constitution's mandate reimbursement requirement (Cal. Const., art. XIII B, § 6) or the separation of powers (Cal. Const., art. III, § 3).

We hold, in agreement with the Court of Appeal, that the method chosen by the Legislature to pay for the two mandates does not on its face violate the state Constitution. The Legislature has broad authority to determine how it will pay for existing mandates, and neither article XIII B, section 6 of the Constitution nor the separation of powers dictates that additional revenue is the only way the Legislature can satisfy its mandate obligations. Because this case involves a facial

1

challenge, we have no occasion to consider the validity of the statutes as applied to a school district that claims its mandate costs exceed the state funding designated to pay for those costs.

## I.

We begin with an overview of the law governing reimbursement for state mandates and discuss the two mandates at issue in this case.

## A.

Enacted by initiative in 1979, article XIII B, section 6, subdivision (a) of the California Constitution says: "Whenever the Legislature or any state agency mandates a new program or higher level of service on any local government, the State shall provide a subvention of funds to reimburse that local government for the costs of the program or increased level of service," with certain exceptions not relevant here. (Ballot Pamp., Special Elec. (Nov. 6, 1979), text of Prop. 4, p. 17.) To implement article XIII B, section 6, the Legislature created the Commission on State Mandates (Commission) as a quasi-judicial body to "hear and decide upon a claim by a local agency or school district that the local agency or school district is entitled to be reimbursed by the state for costs mandated by the state." (Gov. Code, § 17551, subd. (a).)

Provisions in the Government Code set forth a two-step procedure for local agencies and school districts to petition the Commission to find a state mandate. First, "[t]he local agency [including, for these purposes, a school district] must file a test claim with the Commission, which, after a public hearing, decides whether the statute mandates a new program or increased level of service. (Gov. Code, §§ 17521, 17551, 17555.)"

(*County of San Diego v. State of California* (1997) 15 Cal.4th 68, 81 (*County of San Diego*).)  At this first step, Government Code section 17556 sets forth various circumstances in which the Commission "shall not find costs mandated by the state."  For example, section 17556, subdivision (d) specifies that no reimbursable mandate exists if "[t]he local agency or school district has the authority to levy service charges, fees, or assessments sufficient to pay for the mandated program or increased level of service."  And section 17556, subdivision (e) (section 17556(e)) says the Commission shall not find state-mandated costs if "[t]he statute [or] executive order [alleged to impose a mandate] or an appropriation in a Budget Act or other bill provides for offsetting savings to local agencies or school districts that result in no net costs to the local agencies or school districts, or includes additional revenue that was specifically intended to fund the costs of the state mandate in an amount sufficient to fund the cost of the state mandate."

Second, "[i]f the commission determines there are costs mandated by the state pursuant to [Government Code] Section 17551, it shall determine the amount to be subvened to local agencies and school districts for reimbursement.  In so doing it shall adopt parameters and guidelines for reimbursement of any claims relating to the statute or executive order."  (Gov. Code, § 17557, subd. (a); see *County of San Diego, supra*, 15 Cal.4th at p. 81.)  Implementing regulations provide that the parameters and guidelines shall include "[a]ny [o]ffsetting [r]evenues and [r]eimbursements that reduce the cost of any reimbursable activity" (Cal. Code Regs., tit. 2, § 1183.7, subd. (g)) and "[a]ny [o]ffsetting [s]avings" (*id.*, subd. (h)).

In 2010, the Legislature amended the reimbursement procedures, including the circumstances under which a local agency, school district, or the state may seek to amend the reimbursement parameters and guidelines. (Gov. Code, § 17557; Stats. 2010, ch. 719, § 32.) Before the adoption of Senate Bill No. 856 (2009–2010 Reg. Sess.) (Senate Bill 856), Government Code section 17557 provided: "A local agency, school district, or the state may file a written request with the commission to amend, modify, or supplement the parameters and guidelines" for reimbursement of "costs mandated by the state pursuant to [Government Code] Section 17551." (Stats. 2007, ch. 179, § 14, p. 2249.) Senate Bill 856 modified this provision by enumerating a comprehensive list of circumstances under which a request to amend reimbursement parameters or guidelines may be filed. (Gov. Code, § 17557, subd. (d)(2)(A)–(H).) This list includes an amendment request to "[u]pdate offsetting revenues and offsetting savings that apply to the mandated program and do not require a new legal finding that there are no costs mandated by the state pursuant to subdivision (e) of [Government Code] Section 17556." (Gov. Code, § 17557, subd. (d)(2)(B) (section 17557(d)(2)(B)).)

After the Commission has concluded this two-step process, the Legislature must determine through the annual budget process how to reimburse local agencies for state mandated costs, or it may "suspend the operation of the mandate" for a given budget year "in a manner prescribed by law." (Cal. Const., art. XIII B, § 6, subd. (b)(1); Gov. Code, §§ 17561, 17562.)

## B.

The two mandates at issue in this case are the Graduation Requirements (GR) mandate and the Behavioral Intervention Plans (BIP) mandate.

The GR mandate arises from Education Code section 51225.3, which requires all students to complete two science courses in order to graduate from high school. (Ed. Code, § 51225.3, subd. (a)(1)(C).) The Commission determined in 1987 that this provision imposes a reimbursable state mandate (Com. on State Mandates, Statement of Dec. No. CSM–4181, Jan. 22, 1987), and this mandate determination remains in effect today (Com. on State Mandates, Parameters and Guidelines Amend. No. CSM 4181 A, 04–PGA–30, 05–PGA–05, 06–PGA–05, Dec. 18, 2008).

The BIP mandate arose from legislation requiring the State Board of Education to adopt regulations for "the use of behavioral interventions with individuals with exceptional needs receiving special education and related services." (Stats. 1990, ch. 959, § 1.) In 2000, the Commission found that the adopted regulations imposed a reimbursable mandate. (Com. on State Mandates, Statement of Dec. No. CSM–4464, Sept. 28, 2000.) In 2013, the Legislature repealed those regulations, thereby eliminating the BIP mandate. (Ed. Code, § 56523, subd. (a); Stats. 2013, ch. 48, § 44.) Consequently, plaintiffs' claim with respect to the BIP mandate extends only to 2013.

In 2010, on the same day that the Legislature passed Senate Bill 856, it also passed Assembly Bill No. 1610 (2009–2010 Reg. Sess.) (Assembly Bill 1610). (Stats. 2010, ch. 724.) Section 16 of Assembly Bill 1610 addresses the GR mandate and

provides: "Costs related to the salaries and benefits of teachers incurred by a school district or county office of education to provide the courses specified in paragraph (1) of subdivision (a) of Section 51225.3 shall be offset by the amount of state funding apportioned to the district pursuant to this article [or to the relevant portion of the Education Code for a county office of education] and the amount of state funding received from any of the items listed in Section 42605 that are contained in the annual Budget Act. The proportion of the school district's current expense of education that is required to be expended for payment of the salaries of classroom teachers pursuant to Section 41372 shall first be allocated to fund the teacher salary costs incurred to provide the courses required by the state." That provision is now codified at Education Code section 42238.24.

Section 27 of Assembly Bill 1610 addresses the BIP mandate by adding the following language to section 56523 of the Education Code: "Commencing with the 2010–11 fiscal year, if any activities authorized pursuant to this section and implementing regulations are found [to] be a state reimbursable mandate pursuant to Section 6 of Article XIII B of the California Constitution, state funding provided for purposes of special education pursuant to Item 6110–161–0001 of Section 2.00 of the annual Budget Act shall first be used to directly offset any mandated costs." That provision is now codified at Education Code, section 56523, subdivision (f) (section 56523(f)).

## II.

Petitioners in this case are the California School Boards Association and various school districts and county offices of education (collectively, CSBA). In 2011, CSBA filed a petition

for writ of mandate and complaint for injunctive and declaratory relief in superior court. The operative pleading is the third amended petition and complaint, which alleges that Senate Bill 856 and Assembly Bill 1610 violate the Constitution. Specifically, CSBA alleges (1) that Education Code sections 42238.24 and 56523(f) violate article XIII B, section 6 and article III, section 3 of the Constitution; (2) that Government Code section 17557(d)(2)(B) violates article XIII B, section 6 of the state Constitution "to the extent it allows the State to reduce or eliminate mandate claims by claiming 'offsetting revenues' that do not represent new or additional funding and are not specifically intended to pay for the costs of the mandated program or service, as reflected in the Legislature's directives in Education Code sections" 42238.24 and 56523; (3) that Government Code sections 17570 and 17556 on their face violate article XIII B, section 6 and article III, section 3 of the state Constitution, or that section 17570 violates those constitutional provisions "to the extent it provides a basis for the Director of Finance to seek a new test claim based on these Education Code Provisions"; and (4) that "the current provisions of Government Code sections 17500–17617, facially and as applied, as amended over the past decade," violate article XIII B, section 6 of the state Constitution. CSBA did not challenge these statutes under Proposition 98, the constitutional amendment approved in 1988 that prescribes a minimum level of state funding for education. (Cal. Const., art. XVI, § 8.)

In September 2014, the parties stipulated to bifurcation of "the first and second causes of action from the remaining causes of action." The superior court denied the stipulation without prejudice. CSBA then moved to bifurcate "the first and second

cause of action." The superior court granted "[t]he motion to bifurcate Petitioners' claim for writ of mandate in their Second Cause of Action in order to allow that claim to be litigated prior to the remaining claims," finding that "the issues raised by the claims in the Second Cause of Action are sufficiently distinct . . . both legally and factually from Petitioners' other claims." The superior court subsequently denied the petition for writ of mandate as to the second cause of action.

The Court of Appeal affirmed. (*California School Boards Assn. v. State of California* (2018) 19 Cal.App.5th 566.) It held that the term "offsetting revenues" in Government Code section 17557(d)(2)(B) is not limited to "additional revenue that was specifically intended to fund the costs of the state mandate." (*California School Boards Assn.*, at pp. 584–585.) It further held that "Government Code section 17557, subdivision (d)(2)(B), as applied in Education Code sections 42238.24 and 56523, subdivision (f), does not violate article XIII B, section 6, or article III, section 3, of the California Constitution." (*Id.* at p. 592.) We granted review.

## III.

We first address whether the designation of previously unrestricted funding as "offsetting revenues" in Education Code sections 42238.24 and 56523(f) to pay for the GR and BIP mandates violates the mandate reimbursement requirement in article XIII B, section 6.

## A.

On a facial challenge, we will not invalidate a statute unless it "pose[s] a present total and fatal conflict with applicable constitutional prohibitions." (*California Teachers*

8

*Assn. v. State of California* (1999) 20 Cal.4th 327, 338
(*California Teachers*); see *Today's Fresh Start, Inc. v. Los
Angeles County Office of Education* (2013) 57 Cal.4th 197, 218
[describing this test as "exacting"].)    We have "sometimes
applied a more lenient standard, asking whether the statute is
unconstitutional 'in the generality or great majority of
cases.'" (*Gerawan Farming, Inc. v. Agricultural Labor
Relations Bd.* (2017) 3 Cal.5th 1118, 1138.)    Either way, we
consider only the text and purpose of the statute, and
"petitioners cannot prevail by suggesting that in some future
hypothetical situation constitutional problems may possibly
arise as to the particular *application* of the statute." (*Pacific
Legal Foundation v. Brown* (1981) 29 Cal.3d 168, 180.)

Although CSBA purports to bring both facial and as-
applied challenges to these statutes, CSBA acknowledged at
argument that its use of the phrase "as applied" refers to the
interaction among various provisions in the Government and
Education Codes, and not to the statutes' application to
individual school districts.    Indeed, CSBA has not identified any
school district whose GR or BIP mandate costs exceed the state
funding designated to pay for those costs.    Our inquiry thus
focuses on the facial validity of the statutes.

**B.**

The purpose of article XIII B, section 6 "is to preclude the
state from shifting financial responsibility for carrying out
governmental functions to local agencies." (*County of San
Diego*, *supra*, 15 Cal.4th at p. 81.)    As noted, the Legislature in
2010 enacted statutes directing the use of state funding to
prospectively cover the costs of the GR and BIP mandates.
Education Code section 42238.24 requires districts to use

otherwise unrestricted state funding to pay for teacher salary costs incurred to fulfill the GR mandate, and Education Code section 56523(f) says state funding for special education "shall first be used to directly offset any mandated costs," including costs to fulfill the BIP mandate. According to CSBA, these funding arrangements facially violate article XIII B, section 6.

The crux of CSBA's contention is that the state may not "identify pre-existing education funding as mandate payment" but must instead allocate "additional funding" to satisfy its mandate reimbursement obligation under article XIII B, section 6. CSBA contends the treatment of these funds as "offsetting revenues" under Government Code section 17557(d)(2)(B) "allows the State to eliminate a mandate obligation without actually providing any payment by simply identifying existing funding and designating it 'offsetting revenues.'" "By using Government Code section 17557(d)(2)(B) to circumvent the requirement for additional payment," CSBA argues, "both statutes [Education Code sections 42238.24 and 56523(f)] effectively require schools to use their own proceeds of taxes to pay the costs of these mandates."

Respondents argue that there is no such constitutional requirement and that the Legislature "has flexibility to meet its requirements under article XIIIB, section 6 in a number of ways, including . . . designating state funding to offset the cost of the mandate." Respondents place significant reliance on *Department of Finance v. Commission on State Mandates* (2003) 30 Cal.4th 727 (*Kern*), which rejected a reimbursement claim by two school districts and a county for costs incurred to implement notice and agenda requirements of various education-related programs. (*Id.* at pp. 730–731.)

In *Kern*, we assumed the claimants were legally compelled to participate in one of the programs and held that the claimants had no "entitle[ment] . . . to obtain reimbursement under article XIII B, section 6, because the state, in providing program funds to claimants, already has provided funds that may be used to cover the necessary notice- and agenda-related expenses." (*Kern, supra*, 30 Cal.4th at p. 747.) We observed that the expenses "appear rather modest" and that nothing suggests "a school district is precluded from using a portion of the [state] funds . . . for the implementation of the underlying funded program to pay the associated notice and agenda costs. Indeed, the . . . program explicitly authorizes school districts to do so." (*Ibid.*) We went on to say: "It is conceivable, with regard to some programs, that increased compliance costs imposed by the state might become so great — or funded program grants might become so diminished — that funded program benefits would not cover the compliance costs . . . . In those circumstances, a compulsory program participant likely would be able to establish the existence of a reimbursable state mandate under article XIII B, section 6. But that certainly is not the situation faced by claimants in this case. . . . The circumstance that the program funds claimants may have wished to use exclusively for substantive program activities are thereby reduced, does not in itself transform the related costs into a reimbursable state mandate. (See *County of Sonoma* [*v. Commission on State Mandates* (2000)] 84 Cal.App.4th 1264 [art. XIII B, § 6, provides no right of reimbursement when the state *reduces* revenue granted to local government].)" (*Id.* at pp. 747–748.)

Both *Kern* and *County of Sonoma* involved the first step of the mandate process (i.e., the determination of whether a

mandate exists) and not the second step (i.e., the determination of how to pay for a mandate). But the constitutional reasoning of those decisions informs our inquiry here concerning the Legislature's scope of authority under article XIII B, section 6. Consistent with *Kern* and *County of Sonoma*, we conclude that neither of the challenged statutes in this case presents a "total and fatal conflict" with article XIII B, section 6. (*California Teachers, supra*, 20 Cal.4th at p. 338.)

As noted, article XIII B, section 6 requires the state to "provide a subvention of funds to reimburse" local governments for the costs of state mandates. But article XIII B, section 6 does not prescribe how the Legislature must provide for such reimbursement. In the absence of any limitations on the Legislature's budgeting authority stated in article XIII B, section 6, the Legislature retains broad power to decide how best to meet the reimbursement requirement. (See *California Redevelopment Assn. v. Matosantos* (2011) 53 Cal.4th 231, 254 [the Legislature " 'may exercise any and all legislative powers which are not expressly or by necessary implication denied to it by the Constitution' "]; *Marine Forests Society v. California Coastal Com.* (2005) 36 Cal.4th 1, 31 [the Legislature wields "*plenary* legislative authority except as specifically limited by the California Constitution"].)

Contrary to what CSBA suggests, the appropriation of new funding is not the only means by which the Legislature may approach its reimbursement obligations under article XIII B, section 6. The state Constitution does not bar the Legislature from (1) providing new funding, (2) eliminating a different program or funded mandate to free up funds to pay for a new mandate, (3) identifying new offsetting savings or offsetting

revenue, (4) designating previously unrestricted funding as prospectively allocated for the mandate, or (5) suspending the mandate and rendering it unenforceable for one or more budget years, among other possible options. (See Cal. Const., art. XIII B, § 6, subd. (b)(1); Gov. Code, § 17557, subd. (d)(2).) Pursuant to its broad authority over revenue collection and allocation, the Legislature may increase, decrease, earmark, or otherwise modify state education funding in order to satisfy reimbursement obligations, so long as its chosen method is consistent with Proposition 98 and other constitutional guarantees. (See *Carmel Valley Fire Protection Dist. v. State of California* (2001) 25 Cal.4th 287, 302 (*Carmel Valley*) [" 'it is, and indeed must be, the responsibility of the legislative body to weigh [competing] needs and set priorities for the utilization of the limited revenues available' "].)

Here, the Legislature acted within its authority when it enacted two statutes directing the use of previously non-mandate state funding to prospectively cover the costs of the existing GR and BIP mandates. Although CSBA asserts that the GR funding designation leaves school districts with less unrestricted money to provide general education programming and that the BIP funding designation diminishes the amount of funds available for other special education services, these general claims of insufficient funding, without more, do not make out a constitutional violation. "The circumstance that the program funds claimants may have wished to use exclusively for substantive program activities are . . . reduced" by the designation of a subset of those funds to support mandate costs does not mean the Legislature has run afoul of article XIII B, section 6. (*Kern, supra*, 30 Cal.4th at p. 748.)

CSBA contends that the costs at issue in *Kern* were de minimis whereas the costs to implement the GR and BIP mandates are far more substantial. But there is no dispute that the aggregate funds specified in Education Code sections 42238.24 and 56523(f) are more than sufficient to cover the costs of the GR and BIP mandates. As respondents note, "[t]he Legislature has appropriated between \$20 to \$30 *billion* per year in general purpose funding that must be used to first offset the cost of the graduation requirement mandate," and "CSBA asserts that the graduation requirements mandate costs schools approximately \$200 *million* annually." Similarly, the Legislature allocates over \$3 billion annually in special education funding statewide; CSBA alleges that the annual costs of the BIP mandate were approximately \$65 million. Moreover, CSBA has not shown that the designated funds are insufficient to cover the GR and BIP mandates in any individual school district. It is possible that a school district could bring an as-applied challenge to the statutes at issue here if its GR or BIP mandate costs exceed the amount of state funds designated for reimbursement. But because no such insufficiency has been demonstrated in "the vast majority of [cases]" (*American Academy of Pediatrics v. Lungren* (1997) 16 Cal.4th 307, 343 (plur. opn. of George, C.J.)) or " 'the generality of cases' " (*California Teachers*, *supra*, 20 Cal.4th at p. 347), CSBA's facial challenge cannot succeed.

CSBA's insistence that article XIII B, section 6 requires the state to provide "additional" funding to cover the GR and BIP mandates ultimately rests on its contention that the Legislature may not "identify pre-existing education funding as mandate payment." But article XIII B, section 6 does not

guarantee any baseline of "pre-existing education funding," and CSBA has not alleged that diminution of unrestricted funding for general education or general-use funding for special education as a result of the GR and BIP allocations violates Proposition 98, another mandate obligation, or any other constitutional funding guarantee. Indeed, CSBA concedes that they "are not asserting that the level of unrestricted funding must be held at a certain level that cannot be changed. Petitioners acknowledge that the State can adjust funding (within the parameters of Proposition 98), and the precise mix of unrestricted and restricted (categorical) funding as well as the amount of mandate payments remains subject to a legislative determination." At oral argument, CSBA acknowledged that the Legislature could have reduced each school district's unrestricted funding by an amount equal to the costs of the two mandates, while simultaneously increasing each school district's restricted funding by that same amount. Yet this would have resulted in the same mix of restricted and unrestricted funding that resulted from the Legislature's enactment of Education Code sections 42238.24 and 56523(f). We see nothing in the text or purpose of article XIII B, section 6 that requires the Legislature, exercising its plenary authority over state revenue allocation, to pursue one method instead of the other to achieve the same result.

While acknowledging the Legislature's broad authority to allocate *state* revenue, CSBA argues that the funds specified in Education Code sections 42238.24 and 56523(f) are "local proceeds of taxes" and that the Legislature's allocation of those funds for the GR and BIP mandates unconstitutionally requires local education agencies to use *local* revenues to pay mandate

costs. (See Cal. Const., art. XIII B, § 8; Gov. Code, §§ 7906, 7907.) CSBA explains that whereas *Kern* involved a categorical program for which the Legislature could properly direct the allocation of state funding (see *Kern, supra,* 30 Cal.4th at pp. 746–748 [addressing the Chacon-Moscone Bilingual-Bicultural Education program]; Gov. Code, former § 7906, subd. (e), as amended by Stats. 1989, ch. 1395, § 7, p. 6058 ["categorical aid subventions shall not be considered proceeds of taxes for a school district"]), this case involves unrestricted education funding that constitutes "local proceeds of taxes," and "once certain funding is defined as the education agencies' 'proceeds of taxes,' it is protected by Section 6 and the State's authority is correspondingly limited."

CSBA is correct that Government Code sections 7906 and 7907 define school districts' and county superintendents' "proceeds of taxes" to include unrestricted state education funding. But those statutes do not guarantee or lock into place any baseline of unrestricted state funding, and as explained above, article XIII B, section 6 does not preclude the Legislature from adjusting the mix of state funding allocated for unrestricted versus mandate purposes. Further, article XIII B makes clear that "[w]ith respect to any local government, 'proceeds of taxes' shall include subventions received from the State, *other than pursuant to Section 6*" (Cal. Const., art. XIII B, § 8, subd. (c), italics added), and Government Code section 7906, subdivision (c)(2)(A) likewise provides, "In no case shall subventions received from the state for reimbursement of state mandates in accordance with the provisions of Section 6 of Article XIII B of the California Constitution . . . be considered 'proceeds of taxes' for purposes of this section." Both of these

provisions exclude state funding for mandate costs from the definition of local "proceeds of taxes" while stating no limitation on how the Legislature may cover mandate costs.

CSBA's "local proceeds of taxes" argument ultimately reduces to the assertion that article XIII B, section 6 prohibits the Legislature from allocating the funds specified in Education Code sections 42238.24 and 56523(f) to pay mandate costs because those funds are subventions received from the state other than pursuant to article XIII B, section 6. But even if those funds were previously "local proceeds of taxes," the Legislature has prospectively designated them as subventions for mandate reimbursement in accordance with article XIII B, section 6. CSBA cites no other constitutional provision or authority that bars the Legislature from identifying a portion of previously unrestricted state funding and prospectively designating it to be used to offset mandate costs. Funds so designated are not local proceeds of taxes. (See Cal. Const. art. XIII B, § 8, subd. (c); Gov. Code, § 7906, subd. (c)(2)(A).)

CSBA further contends that the term "offsetting revenues" in Government Code section 17557(d)(2)(B) should be narrowly construed to mean "additional revenue that was specifically intended to fund the costs of the state mandate," which is a phrase that Government Code section 17556(e) uses (together with "offsetting savings") to guide the Commission's determination of whether a state-imposed program gives rise to a reimbursement obligation in the first place. But CSBA advances this statutory argument primarily as a matter of constitutional avoidance, and we have determined there is no constitutional infirmity to be avoided. CSBA also says it is incongruous to permit the state "to identify funding that would

be insufficient to defeat the *creation* of a mandate under section
17556(e) to defeat the right to *reimbursement* for that mandate
under section 17557(d)(2)(B)." But there is nothing incongruous
about a statutory framework that (1) requires no mandate
finding if the Legislature provides local agencies with additional
revenue that is specifically intended to fund a state program at
the onset (Gov. Code, § 17556(e)), while also (2) providing a
separate mechanism for amending reimbursement guidelines
for existing mandates if offsetting revenues are later designated
(*id.*, § 17557(d)(2)(B)). Section 17556(e)'s reference to
"additional revenue" for purposes of mandate determination is
not constitutionally compelled, and the Legislature has broad
authority to enact subsequent legislation for determining how
an existing reimbursement obligation may be satisfied going
forward. CSBA does not cite any legislative history or other
indication that the Legislature intended the term "offsetting
revenues" in section 17557(d)(2)(B) to have the same meaning
as the "additional revenue" phrase in section 17556(e). Instead,
CSBA's briefing argues that the Legislature's intent in enacting
section 17557(d)(2)(B) was to "circumvent[] the restrictions of
section 17556(e)."

In sum, we hold that the Legislature's designation of state
funding in Education Code sections 42238.24 and 56523(f) as
"offsetting revenues" to pay GR and BIP mandate costs under
Government Code section 17557(d)(2)(B) does not violate article
XIII B, section 6 of the state Constitution.

## IV.

We now consider whether Government Code section
17557(d)(2)(B) violates the separation of powers. (See Cal.
Const., art. III, § 3 ["The powers of state government are

18

legislative, executive, and judicial.  Persons charged with the exercise of one power may not exercise either of the others except as permitted by this Constitution."].)

Here CSBA's argument is that Government Code section 17557(d)(2)(B) "provid[es] a procedural mechanism that allows the State to use the parameters and guidelines to negate the mandate decision . . . [and] overrule the Commission's determinations" that the GR and BIP requirements impose reimbursable costs.  CSBA explains:  "It is only after the Commission 'determines there are costs mandated by the state pursuant to [Government Code] Section 17551' that the 'amount' is determined through the parameters and guidelines for reimbursement.[]   (Gov. Code, § 17557(a).)   The mandate determination therefore necessarily includes a finding that the local agency is incurring costs requiring reimbursement; the 'update' allowed by the State's construction of section 17557(d)(2)(B) allows it to direct the Commission to make the opposite finding — that there are no costs requiring reimbursement."   According to CSBA, this construction "dramatically limit[s] the finality of Commission decisions" and therefore violates the separation of powers.  (See *California School Boards Assn. v. State of California* (2009) 171 Cal.App.4th 1183, 1189 (*California School Boards*) [holding that the Legislature violated separation of powers by enacting statutes directing the Commission to reconsider mandate decisions that were already final].)  The proper route for revisiting a mandate determination, CSBA says, is to request a new test claim decision from the Commission pursuant to Government Code section 17570.  (See *County of San Diego v. Commission on State Mandates* (2018) 6 Cal.5th 196, 202–203.)

19

In evaluating this claim, we begin by noting that the Legislature established the Commission as a "quasi-judicial body" tasked with identifying state mandates and calculating the costs of those mandates for purposes of reimbursement. (Gov. Code, § 17500.) The Legislature's objective in creating the Commission was to reduce "reliance by local agencies and school districts on the judiciary" and "relieve unnecessary congestion of the judicial system." (*Ibid.*) Under the scheme adopted by the Legislature, the Commission's mandate determinations are subject to judicial review, but only "on the ground that the commission's decision is not supported by substantial evidence." (Gov. Code, § 17559, subd. (b).)

The Court of Appeal in *California School Boards* opined that "[o]nce the Commission's decisions are final, whether after judicial review or without judicial review, they are binding, just as are judicial decisions. . . . Therefore, like a judicial decision, a quasi-judicial decision of the Commission is not subject to the whim of the Legislature. Only the courts can set aside a specific Commission decision and command the Commission to reconsider, and, even then, this can be done only within the bounds of statutory procedure. (Gov. Code, § 17559, subd. (b).)" (*California School Boards*, *supra*, 171 Cal.App.4th at p. 1201.) The court there found that various legislative directives to set aside or reconsider test claim decisions by the Commission had the effect of "nullify[ing] the finality of specific Commission decisions. Such a case-by-case legislative abrogation of Commission decisions violates the separation of powers doctrine." (*Ibid.*)

We have not had occasion to decide whether a final decision by the Commission is fully analogous to a judicial

decision or whether the Legislature violates the separation of powers when it enacts a statute countermanding or modifying a decision by the Commission, which is itself a creature of statute. "Although the language of California Constitution article III, section 3, may suggest a sharp demarcation between the operations of the three branches of government, California decisions long have recognized that, in reality, the separation of powers doctrine ' "does not mean that the three departments of our government are not in many respects mutually dependent" ' [citation], or that the actions of one branch may not significantly affect those of another branch." (*Superior Court v. County of Mendocino* (1996) 13 Cal.4th 45, 52; see *Carmel Valley*, *supra*, 25 Cal.4th at p. 298.) The constitutional issues discussed by the Court of Appeal in *California School Boards* are not insubstantial, and we do not resolve them here. For purposes of addressing CSBA's argument, we assume without deciding that a legislative enactment negating a mandate determination that has become final may violate the separation of powers. Even so, we find no separation of powers violation because no such negation has occurred here.

While acknowledging that "the 2010 legislation," unlike the statutes at issue in *California School Boards*, "did not directly set aside the original mandate determinations," CSBA argues that Education Code sections 42238.24 and 56523(f), together with Government Code section 17557(d)(2)(B), "had exactly the same practical effect." But the two-step framework governing state mandates distinguishes the initial mandate determination from the subsequent determination of how mandate costs are to be reimbursed. The operation of the 2010 statutes to update reimbursement parameters and guidelines to

account for offsetting revenues does not disturb the underlying
GR and BIP mandate determinations. Those determinations
and the reimbursement obligations they entail remain in effect.
(See Gov. Code, § 17557, subd. (d)(2) [any "request to amend
parameters and guidelines" must be "consistent with the
[Commission's prior] statement of decision"].) Indeed, CSBA
concedes that "the State's position means that districts that do
not receive unrestricted state funding (basic aid districts) *would
be entitled to receive mandate reimbursement* while districts
receiving state funding would not." Although this observation
may raise questions of fairness, it confirms that the statutes at
issue do not nullify any mandate determinations. Going
forward, if the Legislature were to alter the funding directives
in Education Code sections 42238.24 and 56523(f) in a manner
that did not cover the costs of the GR and BIP mandates, then
the state would remain legally obligated to cover those costs,
with no need for a new mandate determination. Respondents
make clear in their briefing that they "do not contend that BIP
and graduation requirements are *not* mandates, in light of the
statutory enactments at issue."

CSBA claims that the Commission's mandate
determination is effectively abrogated when the Legislature
identifies "the very same funding" already rejected as offsetting
revenue for purposes of mandate determination under
Government Code section 17556(e) and relabels it "offsetting
revenue" for purposes of calculating the amount of
reimbursement due under Government Code section
17557(d)(2)(B). As respondents explain, however, the character
of the funding in this case differed materially from one point in
time to the other: "At the time of the Commission's initial

determination that these programs constitute reimbursable mandates, there was no specific legislation directing that specific state funding sources be used to offset the costs of the mandates before claiming reimbursement. Later, the Legislature, as is within its power, specified how the mandates must be paid. That did not alter or impact the Commission's original decisions in any way."

In sum, we hold that mandate reimbursement as provided by the statutes at issue here does not negate the Commission's mandate determinations and therefore does not violate the separation of powers.

## CONCLUSION

We affirm the judgment of the Court of Appeal.


**LIU, J.**


**We Concur:**

**CANTIL-SAKAUYE, C. J.**
**CHIN, J.**
**CORRIGAN, J.**
**CUÉLLAR, J.**
**KRUGER, J.**
**GROBAN, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  California School Boards Association v. State of California
_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 19 Cal.App.5th 566
**Rehearing Granted**
_____

**Opinion No.** S247266
**Date Filed:**  December 19, 2019
_____

**Court:** Superior
**County:**  Alameda
**Judge:**  Evelio M. Grillo


_____

**Counsel:**

Olson, Hagel & Fishburn, Deborah B. Caplan and Richard C. Miadich for Plaintiffs and Appellants.

Jeffrey C. Williams for School Innovations & Achievement as Amicus Curiae on behalf of Plaintiffs and Appellants.

Dannis Woliver Kelley, Chistian M. Keiner and William B. Tunick for San Jose Unified School District, Grossmont Union High School District, Newport-Mesa Unified School District, Poway Unified School District, East Side Union High School District and Fullerton Joint Union High School District as Amici Curiae on behalf of Plaintiffs and Appellants.

Lozano Smith, Sloan R. Simmons, Steve H. Ngo and Nicholas J. Clair for Clovis Unified School District, Elk Grove Unified School District, Folsom-Cordova Unified School District, Porterville Unified School District, Sacramento City Unified School District, San Juan Unified School District, San Ramon Valley Unified School District, Twin Rivers Unified School District, Visalia Unified School District, West Contra Costa Unified School District as Amici Curiae on behalf of Plaintiffs and Appellants.

Jennifer B. Henning for California State Association of Counties, League of California Cities and California Special Districts Association as Amici Curiae on behalf of Plaintiffs and Appellants.

Xavier Becerra, Attorney General, Thomas S. Patterson and Douglas J. Woods, Assistant Attorneys General, Benjamin M. Glickman, Constance L. LeLouis and Seth E. Goldstein, Deputy Attorneys General, for Defendants and Respondents State of California, State Controller John Chiang and Director of the Department of Finance Michael Cohen.

Camille Shelton for Defendant and Respondent Commission on State Mandates.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**


Deborah B. Caplan
Olson, Hagel & Fishburn, LLP
555 Capitol Mall, Suite 400
Sacramento, CA 95814
(916) 442-2952


Seth E. Goldstein
Deputy Attorney General
1300 I Street, Suite 125
Sacramento, CA 95814
(916) 210-6063